J-A18029-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN RE: ADOPTION OF C.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| APPEAL OF: A.G., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 345 WDA 2020 |

Appeal from the Decree Entered February 10, 2020
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
O.A. No. 66 of 2019S

| IN RE: ADOPTION OF: C.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.G., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 346 WDA 2020 |

Appeal from the Order Entered February 7, 2020
In the Court of Common Pleas of Butler County Civil Division at No(s):
D.P. No. 39 of 2018

BEFORE: BENDER, P.J.E., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY DUBOW, J.: FILED SEPTEMBER 8, 2020

In this consolidated appeal, Appellant, A.G. ("Father"), appeals from the February 7, 2020 Order that changed Child's permanency goal to Adoption and the February 10, 2020 Decree that terminated his parental rights to C.G. ("Child") after Butler County Children and Youth Services ("Agency") indicated Father as a perpetrator of child abuse against Child and Father failed to

alleviate the ongoing safety threat by progressing to unsupervised visitation. Upon careful review, we affirm.

PROCEDURAL AND FACTUAL HISTORY

The Honorable Kelley T.D. Streib has provided a thorough and accurate factual and procedural history, which we adopt for purposes of this appeal. See Findings of Fact, Opinion, and Order of Court, filed 2/10/20, at 1-24.[1] In sum, Father and B.G. ("Mother")[2] are parents to Child, who was born in February 2018. Father and Mother never lived together; Father lives with his parents (collectively, "Paternal Grandparents"), and Mother lives with her mother ("Maternal Grandmother"). Father, who does not have any other children, learned of Child's birth when Child was two weeks old and began visiting with Child at Mother's house during the day. Mother taught Father how to change Child's diaper and give Child a bottle. She also showed Father how to "bicycle" Child's legs to help Child have a bowel movement. Mother and Father discussed moving to a custody schedule where Father cared for

_____

[1] The Findings of Fact, Opinion, and Order of Court is time-stamped February 7, 2020, but appears on the docket on February 10, 2020. For the remainder of this Memorandum, we will refer to all filings by the date the filing appears on the docket. See Frazier v. City of Philadelphia, 735 A.2d 113, 115 (Pa. 1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given").

[2] The trial court also terminated Mother's parental rights to Child, and she is not a party in this appeal.

Child every other weekend, and over the next two months, Father progressed to three overnight "visits" with Child.

On Friday, April 27, 2018, in the evening, Father went to Mother and Maternal Grandmother's house to visit Child. Maternal Grandmother agreed to watch Child while Father and Mother drove to the store to get prune juice for two-month-old Child, who was allegedly experiencing constipation. During the errand, Father and Mother got into a car accident.[3] While Father took Mother to the hospital, Paternal Grandparents took over caring for Child at their house. Father arrived home early Saturday morning, after dropping Mother off at her home, and went directly to sleep.

Around 10:00 AM, Paternal Grandmother woke up Father to care for Child. Father repeatedly tried to contact Mother to return Child but could not get in touch with her. Father did not have enough supplies for Child so late in the afternoon he asked A.L.S. ("Paternal Aunt"), who also lived in the home, to watch Child for approximately one hour while he went to the store to buy diapers. On Saturday evening, Father was alone in the house with Child after Paternal Grandparents and Paternal Aunt went out. They returned after Father and Child had gone to sleep for the night.

Early on Sunday morning, Father changed Child's clothes for the first time and noticed bruising on Child's abdomen. Father asked Paternal Aunt,

_____

[3] Child, who was home with Maternal Grandmother, was not in the car at the time of the accident.

who is a nurse,[4] to look at Child's abdomen. She did not recommend that Father take Child to the hospital; rather, she told Father to "watch" the bruising and call Mother. Around noon, Father took Child to a family gathering where he asked Paternal Grandmother to look at the bruising. Paternal Grandmother was not overly concerned.

Father finally got in touch with Mother late on Sunday afternoon. He returned Child to Mother's care, and informed Mother about the bruising. Several hours later, Mother expressed concern and Father drove Mother and Child to the hospital, where hospital staff admitted Child after diagnosing him with numerous non-accidental injuries.[5]

On May 1, 2018, the Agency obtained emergency custody of Child and placed Child in foster care. Ultimately, upon investigation, the Agency ruled out Mother and other family members and indicated Father as the perpetrator of abuse against Child. The Agency based its decision on interviews with Mother, Father, and family members, the timeline and Child's injuries, Father's

_____

[4] Paternal Aunt is not a nurse who specializes in pediatrics.

[5] Specifically, hospital staff treated Child for large bruises to his chest and abdomen; petechiae, or broken blood vessels, on his left shoulder; subconjunctival hemorrhages, or broken blood vessels, in both eyes; a small abrasion to his forehead; seven bilateral rib fractures; a metaphyseal corner fracture in his proximal left fibula, or lower leg close to the knee; an irregularity on his proximal right fibula concerning for corner fracture; and an acute sublingual frenulum injury, or tear under his tongue.

inconsistent statements, Father's failure to seek immediate medical attention for Child, and Father's polygraph test results.[6]  Father initiated an appeal of this decision, but did not follow through with the appeal process.

On June 27, 2018, the trial court adjudicated Child dependent by agreement of the parties.  Over the next twelve months, the trial court held a dispositional review hearing, a status conference, and multiple permanency review hearings.  Father remained engaged in services, maintained employment, maintained housing, completed anger management, participated in a father mentor program, completed a parenting capacity evaluation, and participated consistently in supervised or monitored[7] visitation with Child twice a week and one Saturday per month.  Nevertheless, throughout the pendency of the case, a safety threat remained because Father was the indicated perpetrator of child abuse against Child.  Significantly, Father failed to progress to, or seek, visitation that was not supervised by either the Agency or his family.

On July 23, 2019, when Child was seventeen months old, the Agency filed a Petition for Involuntary Termination of Parental Rights ("TPR Petition") and subsequently filed a Motion for Goal Change.

_____

[6] Mother, Father, and other family members who were alone with Child submitted to polygraph testing concerning Child's injuries.  Father is the only person who did not pass the polygraph test.

[7] Family members supervise the monitored visitation and a caseworker checks in once an hour.

The trial court held hearings on the Motion for Goal Change and TPR Petition on November 5, 2019, December 2, 2019, and January 7, 2020. During the hearings, multiple witnesses testified regarding the events leading up to Child's hospitalization, Child's injuries, and the services provided to Father after Child's placement. See Findings of Fact, Opinion, and Order of Court, filed 2/10/20, at 7-11. Specifically, the trial court heard testimony from Jennifer Clarke, M.D.; Eric Bernstein, Psy.D; Tanya Montgomery, Agency caseworker; Kaitlyn McIntyre, Agency caseworker; Tina Yakamicki, Family Pathways caseworker; Brenda Alter, Specialty Outreach Service ("SOS") executive director; Erin McCracken, SOS caseworker; Tiffany Crotzer, Agency caseworker; Heather Kniess, Agency supervisor; Jarrod Sowa, SOS parent mentor; Paternal Aunt; Paternal Grandmother; and Father.

Dr. Clarke, a physician in the Child Advocacy Center at Children's Hospital of Pittsburgh, testified that she conducted an inpatient consult when Child arrived at the hospital. N.T., 11/5/19, at 16-17. She explained that Child was fussy, but consolable, and verified that Child was diagnosed with seven rib fractures, at least two leg fractures, broken blood vessels in both eyes and on one shoulder, abdominal bruising, and a frenulum tear. Id. at 17-19, 26. Dr. Clarke testified that Child's injuries were a result of physical abuse, the injuries caused Child to experience substantial pain, and that Child probably would have been fussy and would have had trouble feeding when the injuries occurred. Id. at 19, 20, 26. Dr. Clarke stated that the broken blood vessels in the eyes would have been caused by direct trauma or increased

pressure on the chest or belly causing Child to struggle to breathe, the petechiae by impact or grabbing, the rib injuries by direct trauma or squeezing, and the leg fractures by forceful yanking or jerking. Id. at 27, 39, 40. Although Mother had reported to Dr. Clarke that the broken blood vessels in Child's eyes and shoulders resulted from Child struggling to have a bowel movement, Dr. Clarke testified that a two-month-old Child could not generate enough force to cause the broken blood vessels. Id. at 21, 27. Finally, Dr. Clarke testified that the injuries had occurred within three days prior to Child's hospitalization on Sunday night, and were likely the result of more than one occasion of physical abuse. Id. at 43.

Dr. Bernstein completed a Parenting Capacity Evaluation of Father and a Bonding Evaluation. He testified that Father demonstrated adequate parenting skills. Id. at 54-55. However, Dr. Bernstein expressed concern over Father's lack of understanding about the serious nature of Child's injuries. Id. at 56-57, 82-83. Finally, Dr. Bernstein stated that Child, who was almost two years old at the time of the hearing, recognizes the foster parents as his "psychological parents" and that a termination of Father's parental rights would not have a significant negative impact on Child. Id. at 58.

The Agency caseworkers testified, in sum, that Father complied with his Family Service Plan objectives but a safety threat remained because Father was an indicated perpetrator of abuse against Child.

Erin McCracken, one of the SOS caseworkers who supervised visits between Father and Child, testified that Father consistently attended visits

and the visits were appropriate. N.T., 12/2/19, at 8, 12, 28. Ms. McCracken further testified that Father's extended family always attended the visits that occurred in the home, which began with Father's visits supervised by SOS in the home and then progressed to visits supervised by the Paternal Grandparents in the home. She stated that she explained to Father that he would need to progress toward frequent and longer visits with Child in the community without family members around, and care for and maintain Child's safety without family members around. Although Father participated in a few supervised community visits, both with and without family, SOS had concerns because Father refused community visits several times without explanation. Id. at 5-42. Ms. McCracken explained that when Father's family is present, they all provide care for Child. Id. at 40.

Mr. Sowa testified that he served as a parent mentor to Father, Father was receptive to the mentoring, and Mr. Sowa did not observe Father having any anger issues. Id. at 90-93.

Paternal Aunt testified that she has been a nurse for eight years but does not treat children, that she is a mandated reporter, and that she observed the bruises on Child's stomach, but because Child did not seem like he was in distress, she advised Father to just keep an eye on the bruises. Id. at 102-118. Paternal Aunt further testified that she asked the Agency to consider her as a placement resource for Child; the Agency evaluated her home in January 2019; and the Agency informed her that she could not be a

placement resource for Child because she did not advise Father to take Child to hospital when she observed Child's injuries. Id.

Paternal Grandmother testified that Father was the primary caretaker during visits but the family helped sometimes; that she did not notice the Child being fussy on the weekend in question; and that she never learned the extent of Child's injuries beyond the bruising. Id. at 119-144.

Father testified that he lives with his parents, he works for a construction company, he participated in a father-mentoring program, and he completed anger management. N.T., 1/7/20, at 5, 15-20. Father testified that he has supervised or monitored visits with Child on Mondays from 1:30 PM to 7:00 PM, Thursdays from 4:00 PM to 7:00 PM, and one Saturday per month from 3:30 PM to 7:00 PM. Id. at 12-13. Father also testified that his family members are usually present—including Paternal Grandparents, Paternal Aunt and her husband, Father's brother, and family friends—except Mondays until 4:00 PM, when it is just Father, Child, and a SOS caseworker at the visits. Id. Father testified that during the visits, he is usually Child's primary caretaker; he plays with Child, puts Child down for a nap, and then the family typically has a big family dinner. Id. at 14-15, 21. Father testified that he has participated in several community visits with Child. Id. at 37-39, 52-53.

Father stated that on the weekend of April 27, 2018, he noticed bruising on Child's stomach on Sunday morning and was concerned, but did not immediately take Child to the hospital because Father was not on Child's birth certificate and did not have Child's medical information. Id. at 23, 35. When

counsel asked if Father had performed the bicycle motion with Child's legs that weekend, Father invoked his Fifth Amendment right against self-incrimination. Id. at 49-50. Father testified that he did not cause injuries to the Child and had taken some steps to appeal his status as an indicated perpetrator of abuse against Child. Id. at 41-42. Father stated, "I would like to get [Child] back." Id. at 45.

After considering the evidence and reviewing Briefs, the trial court changed Child's permanency goal to Adoption and terminated Father's parental rights to Child.

Father timely appealed. Both Father and the trial court complied with Pa.R.A.P. 1925.

ISSUES RAISED ON APPEAL

Father raises the following issues for our review:

1. Did the [trial] court commit an error of law when it determined that the [the Agency] proved by clear and convincing evidence that [Father]'s parental rights should be terminated pursuant to [23 Pa.C.S. § 2511(a)(2), (5), and (8)].

2. Did the trial court abuse its discretion when it failed to find [Father] successfully alleviated the circumstances that led to the placement of [C]hild?

3. Did [the Agency] fail to show by clear and convincing evidence that safety concerns continued, thus the trial court abused its discretion in terminating [Father]'s parental rights?

4. Did the trial court commit an error of law when it determined that there was sufficient evidence to support a finding that the termination of parental rights served the best interest and welfare of [C]hild pursuant to [23 Pa.C.S. § 2511(b)]?

5. Did the [trial] court commit an error of law when it determined that [the Agency] proved by clear and convincing evidence that the goal should be changed from Reunification to Adoption?

6. Did the trial court abuse its discretion in that it disregarded [Father]'s full compliance and full progress of [] Child's Permanency Plan?

7. Did [the Agency] fail to show by clear and convincing evidence that safety concerns continued to exist and thus the trial court abused its discretion in changing the goal from Reunification to Adoption?

8. Did the trial court fail to consider all of the testimony and evidence before rendering its decision to change the goal from Reunification to Adoption?

9. Did [the Agency] fail to explore potential relatives of [C]hild as resources for [A]doption and/or permanency placement?

10. Did [the Agency] fail to provide proper services to alleviate the circumstances that led to the placement of [C]hild?

11. Did [the Agency] fail to provide reasonable efforts to reunify [C]hild with [Father]?

12. Did the trial court disregard that [Father] is ready, willing, and able to care for [C]hild pursuant to [In re M.L., 757 A.2d 849 (Pa. 2000)]?

13. Did the trial court fail to exclude certain evidence that could not and should not have been considered in rendering its decision to terminate [Father]'s parental rights and change the goal from Reunification to Adoption?[8]

Father's Br. at 8-10 (reordered for ease of disposition).

LEGAL ANALYSIS

When we review a decision of trial court to terminate parental rights, we must accept the findings of fact and credibility determinations of the trial

_____

[8] Father has declined to pursue this issue on appeal. See Father's Br. at 36-37.

court if the record supports them. In re T.S.M., 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." Id. (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. T.S.M., 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." Id. Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." In re M.G., 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

In addressing petitions to terminate parental rights involuntarily, the Adoption Act requires the court to conduct a bifurcated analysis. See 23 Pa.C.S. § 2511(a) and (b). The court must first focus on the conduct of the parent, and, if the party seeking termination presents clear and convincing evidence that the parent's conduct meets one of the grounds for termination set forth in Section 2511(a), then the court will analyze whether termination of parental rights will meet the needs and welfare of the child, i.e., the best interests of the child, as provided in Section 2511(b). The court must examine the existence of the child's bond with the parent, if any, and the potential effect on the child of severing such bond. In re L.M., 923 A.2d 505, 511 (Pa.

Super. 2007). A parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his parental duties, to the child's right to have proper parenting and fulfillment of the child's potential in a permanent, healthy, safe environment. In re B.,N.M., 856 A.2d 847, 856 (Pa. Super. 2004).

Instantly, in his first four issues, Father avers that the trial court abused its discretion when it terminated his parental rights under multiple subsections of 23 Pa.C.S. § 2511(a) and subsection (b). Father's Br. at 31. We need only agree with its decision as to any one subsection of Section 2511(a) and subsection (b) in order to affirm the termination of parental rights. See In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004). For the following reasons, we conclude that the trial court correctly determined that the Agency met its burden of proof under 23 Pa.C.S. § 2511(a)(2) and (b).

Termination Pursuant to 23 Pa.C.S. § 2511(a)(2)

Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); In re Adoption of S.P., 47 A.3d 817, 827 (Pa. 2012). The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative

- 13 -

misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. In re A.L.D., 797 A.2d 326, 337 (Pa. Super. 2002).

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. Id. at 340. "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." B.,N.M., 856 A.2d at 855 (citation omitted). Rather, "[a] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." Id. (citation omitted).

Applying these principles, the trial court concluded that Father's status as an indicated perpetrator of child abuse against Child, which poses an ongoing safety threat to Child, combined with Father's reluctance to engage in community visits with Child without his family present, rendered him incapable of parenting Child and caused Child to be without essential parental care, control, or subsistence for over two years. The trial court opined:

> Father's participation in services has not remedied the condition that caused Child to be removed from Mother and Father's care. Child's injuries are still unexplained. Father is still the indicated perpetrator of abuse, and prima facie evidence exists for this [c]ourt to find that Father committed [c]hild abuse against Child.

- 14 -

Father has not presented evidence to rebut the presumption that he abused Child.[9]

. . . After [22] months in foster care, Father has not sufficiently remedied the conditions that led to Child's removal. Father will not or cannot remedy the conditions and causes of the abuse and subsequent safety threat posed by Father's status as a perpetrator of abuse. After [22] months, Child is still in foster care, and Father has nothing more than supervised and monitored visits. Father has declined opportunities for lesser supervision of his visits and visits in the community, which were intended to measure Father's parenting ability and Child's safety with Father [without Father's family present]. Despite knowing the purpose of such suggestions from SOS and [the Agency], Father still declined to engage in lesser-supervised visits with Child in the community. Father has not made diligent efforts toward the prompt assumption of full parental duties . . . This constitutes a repeated and continued incapacity, abuse, neglect, or refusal that has caused Child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being, and Father cannot or will not remedy the conditions and causes of incapacity.

Trial Court Opinion, filed 3/16/20, at 28-29. The trial court also highlighted that Father never requested a court-ordered decrease in the level of supervision during his visitation with Child, and the court made a finding that Father still does not understand the full extent of Child's non-accidental injuries. Id. at 28. Our review of the record supports the trial court's findings.

_____

[9] Section 6381 of the Child Protective Services Law provides:

Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S. § 6381(d).

We decline to usurp the trial court's creditability determinations or reweigh the evidence.

Father cites to *In the Interest of N.M.*, 186 A.3d 998 (Pa. Super. 2018), to support his argument that the trial court abused its discretion in terminating Father's parental rights based solely the safety concern that Father "cannot or will not explain the Child's injuries." Father's Br. at 38-41. This argument is unpersuasive.

In N.M., this Court vacated permanency review orders denying kinship care placement, and, consequently vacated termination decrees, after concluding that the trial court abused its discretion when it refused to consider placing a child, who suffered unexplained rib fractures, in kinship care until the parents explained the injuries. Id. at 1011-13.

Here, the trial court did not terminate Father's parental rights based solely on Father's inability or unwillingness to explain Child's injuries. Rather, the trial court based its decision on the totality of the circumstances, including Father's undisputed status as an indicated perpetrator of abuse against Child, Father's failure to progress to unsupervised or unmonitored visitation, and the amount of time that Child was in placement.

For the foregoing reasons, we conclude that the trial court did not abuse its discretion when it terminated Father's parental rights pursuant to Section 2511(a)(2).

Termination Pursuant to 23 Pa.C.S. § 2511(b)

Father also contends that the trial court abused its discretion when it determined that it was in Child's best interest to terminate Father's parental rights pursuant to Section 2511(b). Father's Br. at 10. We conclude, however, that the evidence supports this finding of the trial court, and therefore the court did not abuse its discretion.

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. In particular, we review whether "termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." In re Adoption of J.M., 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." In re C.M.S., 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted).

One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, "with close attention paid to the effect on the child of permanently severing any such bond." In re Adoption of N.N.H., 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. In re A.D., 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship.

Id. at 898. Moreover, the trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. In re N.A.M., 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. In re Z.P., 994 A.2d 1108, 1121 (Pa. Super. 2010).

Father avers that a bond exists between him and Child and that severing that bond would prove detrimental to Child. Father's Br. at 49-50. Father argues that the testimony of Dr. Bernstein, who stated that Father and Child have a "positive bond," demonstrates that termination of Father's parental rights is not in Child's best interest. Id. at 49.

Father fails, however, to recognize that the trial court also heard Dr. Bernstein testify that the bond is "limited to a degree by the level of contact, [F]ather's limited responsibility for [C]hild's needs, and the nature in which he is participating with [C]hild in supervised visits[.]" N.T., 11/5/19, at 61. Significantly, Dr. Bernstein characterized Father as "an ancillary support" in Child's life, and testified that Child viewed the foster parents, who are an adoptive resource, as "psychological parents upon whom he relies for his everyday needs and with whom he shares a strong bond." Id. at 61-62.

The trial court credited Dr. Bernstein's testimony that, despite a bond between Father and Child, terminating Father's parental rights would not have a significant negative impact upon Child due to Child's age, the fact that Child has lived with foster parents since he was two months old, and the strong

bond between Child and foster parents. Trial Ct. Op., 3/16/20, at 34-35. The trial court opined:

> Despite any bond between Child and Father, Child's need for safety, stability, and permanency outweigh any potential harm to Child[] from the severing of Father's parental rights. Stability and family permanence are critical to the health and welfare of dependent Children. . . There is no credible, record evidence that Child would be harmed by severing Father's parental rights. There is credible record evidence that, due to his age, Child would not be significantly negatively impacted by severing the parental bond with Father.

Id. at 35. Based on these factors, the trial court concluded that terminating Father's parental rights would be in Child's best interest. Id.

Our review of the record supports the factual findings of the trial court and, once again, we decline to reweigh the evidence. The evidence supports the trial court's conclusion that terminating Father's parental rights is in Child's best interest. Accordingly, we find no abuse of discretion.

Permanency Goal Change from Reunification to Adoption

In his next three issues, Father challenges the trial court's decision to change Child's permanency goal from Reunification to Adoption. Father's Br. at 8-9. We find no abuse of discretion.

We review a trial court's decision to change a child's permanency goal to Adoption for an abuse of discretion. In re R.J.T., 9 A.3d 1179, 1190 (Pa. 2010). In order to conclude that the trial court abused its discretion, this Court "must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action

was a result of partiality, prejudice, bias or ill will, as shown by the record." Interest of H.J., 206 A.3d 22, 25 (Pa. Super. 2019) (citation omitted). Our standard of review in dependency cases requires this Court "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." R.J.T., 9 A.3d at 1190. This Court is "not in a position to make the close calls based on fact-specific determinations." Id. Rather, "we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan." Id. Notably, even if this Court "would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court." Id.

The overarching purpose of the Juvenile Act, which governs goal change requests, is "[t]o preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S. § 6301(b)(1). At each dependency review hearing, the trial court must consider, inter alia, the continuing necessity for and appropriateness of the child's placement, the extent of compliance with the permanency plan, the extent of progress made toward alleviating the circumstances which necessitated the child's placement, the appropriateness and feasibility of the current placement goal for the child, the likely date the

goal might be achieved, and the child's safety. 42 Pa.C.S. § 6351(f). The focus of goal change proceedings, like all dependency proceedings, is on "the safety, permanency, and well-being of the child and the best interests of the child must take precedence over all other considerations." H.J., 206 A.3d at 25.

"[T]he agency has the burden to show [that] a goal change would serve the child's best interests[.]" In re R.M.G., 997 A.2d 339, 347 (Pa. Super. 2010) (citations omitted). If reunification with the child's parent or guardian is not in the child's best interest, the trial court may determine that adoption is the appropriate permanency goal. H.J., 206 A.3d at 25; 42 Pa.C.S. § 6351(f.1)(2). Notably, "[a]doption may not be an appropriate permanency goal if severing an existent parent-child bond would have a detrimental effect on a child." H.J., 206 A.3d at 25. **Further,** "[b]ecause the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan." R.M.G., 997 A.2d at 347.

Father avers that the trial court abused its discretion when it changed Child's permanency goal from Reunification to Adoption after it had found during a June 2019 permanency review hearing that Father had fully progressed with Child's permanency plan. Father's Br. at 35. Father also argues that the record does not support the trial court's findings that safety

concerns remain and that Father failed to request unsupervised visitation with Child. Id. at 42-44.

As stated above, when deciding whether to change a child's permanency goal, the focus is on the child's best interest rather than the parent's compliance. Accordingly, the trial court's June 2019 finding that Father made "full progress" on the permanency plan does not dictate that a goal of Reunification is in Child's best interest. See Permanency Review Order, 6/25/19. Rather, a court must consider the Section 6351 factors to determine what is in child's best interest, as the trial court did in this case. The trial court opined:

> As demonstrated by the findings of fact . . . this [c]ourt considered the necessity and appropriateness of the placement of Child, the extent of compliance with the service plan, the extent of progress towards alleviating the circumstances necessitating placement, the appropriateness of the current placement goal, the likely date the goal might be achieved, Child's safety, and the length of time Child has been in foster care, ultimately finding that changing the goal from [R]eunification to [A]doption was appropriate as established by the evidence. . . . In dependency proceedings, the child's safety is of paramount importance. In the instant matter, this Court found, at the permanency review hearing held contemporaneously with the hearing on the Petition to Terminate Parental Rights, that there was a current safety threat, in that Father was the indicated perpetrator of physical abuse of Child, and that neither Child nor Father had protective capacities to compensate for the safety threat.

Trial Ct. Op., filed 3/23/20, at 37, 39. The trial court also found that Father was not ready to have unsupervised parenting time. That finding is supported by testimony that Father repeatedly declined the opportunity for visits with

Child in the community, without assistance or "supervision" from family members. Id. at 40; N.T. 12/2/19, at 5-42. The trial court further opined:

> There was no evidence to indicate when he might be ready and/or once ready, how much longer until he was ready and able to have full physical custody of Child. . . . Child needs permanency, and the current permanency goal of [R]eunification with Father was not imminent. The record supports by clear and convincing evidence the goal change to [A]doption.

Trial Ct. Op., filed 3/23/20, at 40. The record supports the trial court's findings and we find no abuse of discretion.

Trial Court's Consideration of All of the Evidence

In his eighth issue, Father contends, for the first time on appeal, that the trial court failed to consider all of the evidence presented at the three-day goal change and termination hearings, as evidenced by its signing the goal change order on December 2, 2019, after the second hearing, which it ultimately filed on February 7, 2020, after the final hearing. Father's Br. at 8. This issue is waived. See Pa.R.A.P 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Relatives as Placement Resources

In his ninth issue, Father avers that the Agency failed to explore Child's relatives as placement resources. Father's Br. at 44. This issue is meritless, as the record reflects that, in fact, the Agency did consider the Paternal Aunt as a placement resource but could not recommend her. The trial court opined:

> [A]t the time Child was placed, Child could not have been placed with either parent, Maternal Grandmother, Paternal Grandmother, Paternal Grandfather, Paternal Aunt, or Paternal Uncle, as all of

those relative had been left alone with Child during the time period when he was injured. While Paternal Aunt testified that she requested Child be placed with her in January 2019, she was not considered due to the concerns that [the Agency] had about her failure to recommend medical treatment for Child and Child's bond with the foster parents. Prior to her [January 2019] request, Paternal Aunt was not eligible to be a placement option for Child when she lived in the same home as Father. Child had been placed with the foster parents for almost a year when Paternal Aunt stated that she finally moved out of Paternal Grandparents' home. By that point, Child was bonded with the foster family, and it was not in Child's best interest to be moved.

Trial. Ct. Op., filed 3/23/20, at 47. The record supports the trial court's findings and we find no abuse of discretion.

Agency Services and Reasonable Efforts

In his next two issues, Father baldly avers that the Agency failed to provide proper services to alleviate the circumstances that led to the placement of Child and that the Agency failed to provide reasonable efforts to reunify Child with Father. Father's Br. at 9. Because of Father's lack of specificity, the trial court was unable to identify exactly what issues the court needed to address on appeal. See Trial Ct. Op., 3/23/20, at 45-48. Thus, we find both issues waived. See Commonwealth v. Dowling, 778 A.2d 683, 686-87 (Pa. Super. 2001) (citations omitted) (explaining "[w]hen a court has to guess what issues an appellant is appealing, that is not enough for meaningful review" and holding that waiver of the issue is appropriate).

In re M.L.

In Father's final issue, he avers that the trial court disregarded that he is ready, willing, and able to care for Child pursuant to M.L., supra. Father's

Br. at 44. In his two-sentence argument, Father incorporates the entirety of his Brief but fails to include any discussion of M.L. or how that case relates to Father and Child, thus hampering our review. "This Court will not act as counsel and will not develop arguments on behalf of an appellant." Commonwealth v. Hardy, 918 A.2d 766, 771 (Pa. Super. 2007). Accordingly, we conclude this issue is waived.

CONCLUSION

In conclusion, the trial court did not abuse its discretion when it changed Child's permanency goal to Adoption and terminated Father's parental rights. Accordingly, we affirm.

Decree affirmed. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/08/2020